IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,       )
                                )
                                )
                v.              )       2:12-cr-00224
                                )
                                )       Chief District Judge Mark R. Hornak
CURTIS DELAY BROWN,             )
                                )
                Defendant.      )

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Before the Court is Defendant Curtis Delay Brown's second Motion to Reduce Sentence Pursuant to Section 404 of the First Step Act (ECF No. 332) ("Motion"). In 2015, Mr. Brown was convicted of unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (ECF Nos. 19, 169), and he is currently serving a term of imprisonment of 180 months followed by a two-year term of supervised release (ECF No. 182).

On May 17, 2020, Mr. Brown filed his first Motion to Reduce Sentence (ECF No. 289) in which he argued that his latent tuberculosis and substantial efforts to rehabilitate himself constituted "extraordinary and compelling reasons" for his release as required by the First Step Act. *See* 18 U.S.C. § 3582(c)(1)(A)(i). The Court denied the first Motion to Reduce Sentence without prejudice. (ECF No. 306.)

Based on the record now before the Court as to Mr. Brown's second and presently pending Motion to Reduce Sentence, which the Court has carefully considered and evaluated pursuant to its authorized discretion in such matters, the Court concludes that Mr. Brown has demonstrated extraordinary and compelling reasons sufficient for this Court to reduce his sentence and that a sentence reduction is consistent with the sentencing factors articulated in 18 U.S.C. § 3553(a).

1

Accordingly, the Court concludes that Mr. Brown's situation supports the grant of the relief he seeks, and the Court therefore GRANTS Mr. Brown's Motion to Reduce Sentence (ECF No. 332) on the terms as set forth in this Opinion and the Court's accompanying Order.

## I.    BACKGROUND

Mr. Brown was convicted by a jury on May 20, 2015 of unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. 922(g)(1). (ECF No. 305, at 1.)[1] He was sentenced on July 2, 2015 to 180 months of imprisonment—the mandatory minimum that applied under § 924(e) given his prior criminal conviction record—followed by two years of supervised release. (ECF Nos. 182; 305, at 1–2.)

Mr. Brown previously filed a Motion to Reduce Sentence pursuant to Section 404 of the First Step Act on May 17, 2020 (ECF No. 289), which the Court denied (ECF Nos. 305, 306). On January 23, 2021, Mr. Brown filed the presently pending Motion, his second Motion to Reduce Sentence (ECF No. 332), reiterating some of the arguments he made in his first Motion and making new ones on top of those. The Government filed a Response on February 9, 2021 (ECF No. 340), to which Mr. Brown replied (ECF No. 343). The Court heard oral argument on the Motion on March 25, 2021. (ECF No. 350.)

On August 2, 2021, the Court stayed Mr. Brown's second Motion to Reduce Sentence pending the Third Circuit's decision in *United States v. Andrews*, which was expected to address "the scope of a district court's authority to determine what types of circumstances may even be considered to rise to the level of extraordinary and compelling," including whether district courts

---

[1] Mr. Brown was indicted for this crime in August 2012, and his first jury trial and jury conviction for this crime occurred in 2014. (ECF Nos. 97; 305, at 1.) Mr. Brown appealed that conviction on the basis that the district judge admitted certain evidence in violation of the Federal Rules of Evidence; he won that appeal and took his case to a jury again on remand, which led to his 2015 conviction from which the sentence at issue in this Motion stems. (ECF No. 305, at 1.)

are bound by U.S. Sentencing Commission policy statements issued before the latest amendments to § 3582(c)(1)(A) via the First Step Act. (ECF No. 393, at 1–2.) It appeared to the Court that the Third Circuit's anticipated *Andrews* decision would likely impact the Court's consideration and resolution of Mr. Brown's Motion, given that the Motion asserts multiple bases for compassionate release or sentence reduction that are not necessarily covered by the Sentencing Commission policy statements but that may be factors that a district court is permitted to consider. (*See id.*) The Court ordered that once *Andrews* had been decided, the parties were to file statements of position as to the impact, if any, that the decision in *Andrews* had on Mr. Brown's Motion. (*Id.* at 2.) The Third Circuit issued its decision in *Andrews* on August 30, 2021, 12 F.4th 255 (2021), and the parties filed their statements of position thereafter (ECF Nos. 396, 397). The Court lifted the stay as to Mr. Brown's Motion on December 21, 2021 after the Third Circuit issued its mandate as to the *Andrews* case. (ECF No. 399.)

During the pendency of Mr. Brown's Motion, on August 17, 2021, the Bureau of Prisons (BOP) released Mr. Brown to home confinement pursuant to the CARES Act. (ECF No. 395, at 1.) BOP records indicate that Mr. Brown is still on home confinement. *See Find an Inmate*, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited July 8, 2022).[2]

---

[2] Initially, the BOP was required to recall all prisoners from home confinement back to prison at the end of the emergency period provided for in the CARES Act. *See Compassionate Release: The Impact of the First Step Act and COVID-19 Pandemic*, U.S. Sentencing Commission (March 2022), at 67 n.46, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220310_compassionate-release.pdf. But on December 21, 2021, the Department of Justice Office of Legal Counsel issued an opinion reversing that earlier guidance. *Id.* The December 2021 opinion explained that the BOP has "discretion over whether individual offenders currently serving their sentences under home confinement [are] required to return to prison." "*Id.* A statement accompanying the opinion indicated that the U.S. Department of Justice will engage in a rulemaking process that will further guide who can continue serving sentences on home confinement and who will be returned to prison." *Id.*

Thus, while the BOP would not be required by the currently applicable Department of Justice opinion to return Mr. Brown to prison at the end of the period provided for in the CARES Act, the possibility that Mr. Brown may at some point be returned to prison to serve the remainder of his period of incarceration is a real one. For that reason, the Court considers the arguments made in Mr. Brown's Motion as they related to him being incarcerated at a BOP facility as well as the impact that his present home confinement status has on his Motion.

## II.    LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010) (citing 18 U.S.C. § 3582(c)). One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582, also known as the compassionate release statute. As amended, that statute allows a court to reduce a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). In addition, the court must consider: (1) whether the defendant has exhausted the appropriate administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they apply; and (3) whether such a reduction is consistent with applicable U.S. Sentencing Commission policy statements. § 3582(c)(1)(A).

## III.    DISCUSSION

After analyzing the record, the Court concludes that Mr. Brown has demonstrated extraordinary and compelling reasons for this Court to reduce his sentence, with such reasons specifically consisting of the combination of his severe hypertension, his obesity, and his extraordinary record of rehabilitation. Further, the Court concludes that consideration of the sentencing factors in 18 U.S.C. § 3553(a) weighs significantly in favor of reducing Mr. Brown's sentence.

### A. Administrative Exhaustion

The Court first considers whether Mr. Brown has complied with § 3582(c)(1)(A)'s exhaustion requirement. Prior to petitioning a district court for relief under § 3582(c)(1)(A), a defendant must first file an administrative request for compassionate release or a sentence reduction with the warden of the facility where the defendant is incarcerated; the defendant must

then either (1) "fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) wait 30 days from the date on which the defendant filed an administrative request with the warden. § 3582(c)(1)(A). Either option for administrative exhaustion under § 3582(c)(1)(A), standing alone, is sufficient to satisfy the exhaustion requirement. *See United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020) (explaining that "the statute states that [a] defendant may file [a] motion [in the district court] thirty days after the warden receives his request" regardless of whether the warden has denied the request within those thirty days).

Here, the Court concludes that Mr. Brown has met the administrative exhaustion requirement. According to his Motion and exhibits attached to it, Mr. Brown submitted a compassionate release request "based upon his deteriorating health to the Warden of FCI Hazelton on December 1, 2020" and upon his rehabilitation efforts, and "[t]he Warden denied his administrative request by letter dated December 17, 2020." (ECF Nos. 332, at 3; 332-2, at 1; 332-3, at 1.) Mr. Brown then filed this Motion on January 23, 2021, which is beyond 30 days from the date on which he filed his request with the Warden at FCI Hazelton.

## B. **"Extraordinary and Compelling Reasons"**

Next, the Court must determine whether (1) Mr. Brown's medical conditions, generally or specifically in light of the COVID-19 pandemic, in the context of (2) Mr. Brown's demonstrated rehabilitation, constitute "extraordinary and compelling reasons" such that § 3582(c)(1)(A)(i) would permit this Court to release Mr. Brown from incarceration or reduce his sentence.

Section 3582 does not define the phrase "extraordinary and compelling reasons." *See* § 3582(c)(1)(A)(i). Instead, Congress delegated that task to the U.S. Sentencing Commission. *See* 28 U.S.C. § 994(t) (stating that the Sentencing Commission "shall describe what should be

considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). The Sentencing Commission defined "extraordinary and compelling reasons" under the pre-First Step Act version of § 3582(c)(1)(A)(i) in a policy statement contained in § 1B1.13 of the U.S. Sentencing Guidelines Manual, relating to the BOP's discretion to reduce a prisoner's term of imprisonment. As relevant here, that policy statement, via its application notes, provides that extraordinary and compelling reasons include, among others, (1) "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" and (2) reasons other than those specifically enumerated that are extraordinary and compelling on their own or in combination with enumerated reasons. U.S.S.G. § 1B1.13, cmt. n.(1)(A)(ii).

The Sentencing Commission has not issued an updated policy statement since the First Step Act became law. *See United States v. Rodriguez*, 451 F. Supp. 3d 392, 396 (E.D. Pa. 2020). In *United States v. Andrews*, the Third Circuit explained that given the lack of an updated applicable Sentencing Commission policy statement defining "extraordinary and compelling reasons," "the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions" for compassionate release. 12 F.4th at 259. However, "although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons." *Id.* at 260. This is because "Congress legislates against the backdrop of existing law," and thus, by "reenact[ing] the compassionate-release statute without any alterations to the phrase 'extraordinary and compelling reasons,'" Congress likely intended the phrase to retain the meaning that the Sentencing Commission gave it in its pre-First Step Act policy statement. *Id.* Therefore, in reviewing this Motion, this Court does not treat U.S.S.G. §

1B1.13 and the accompanying application notes as "an ultimate binding authority," but the Court nonetheless considers them as part of its analysis. *Id.*

While the Court is not bound by the Sentencing Commission's policy statement and application notes at U.S.S.G. § 1B1.13, the Court is bound by 28 U.S.C. § 994(t). That statute provides that in any policy statement that the Sentencing Commission may promulgate regarding 18 U.S.C. § 3582(c)(1)(A), or in a court's own application of § 3582(c)(1)(A), "rehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason." *See* 28 U.S.C. § 994(t) (emphasis added). As another district court has observed, "[f]or the word 'alone' [in § 994(t)] to do any work—as it must—that means courts can consider rehabilitation as part of a compassionate release motion." *United States v. Brown*, 457 F. Supp. 3d 691, 701 (S.D. Iowa 2020); *see United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020) (citing *United States v. Brooker*, 976 F.3d 228, 237–38 (2d Cir. 2020)); *United States v. Henriquez*, No. 15-225-1, 2021 WL 5771543, at *4 (M.D.N.C. Dec. 6, 2021).

Courts have taken different approaches as to whether an independently extraordinary and compelling reason must exist before the court can consider or credit rehabilitation. *Compare United States v. Taylor*, No. 03-238, 2022 WL 1321989, at *5 (W.D. Pa. May 3, 2022) ("If there were another reason that would warrant reducing his sentence, Defendant's rehabilitation would weigh strongly in favor of that result. However, . . . rehabilitation is the one reason that cannot justify reducing a defendant's sentence on its own[,] [and] . . . Defendant is not facing . . . any other extraordinary and compelling circumstance."), *and United States v. Adens*, No. 12-616-2, 2022 WL 1226965, at *5 (E.D. Pa. Apr. 26, 2022) ("Because neither [the defendant's] medical conditions nor family circumstances establish an extraordinary or compelling reason for [his] release, his efforts at rehabilitation alone will not suffice."), *with United States v. Clausen*, No. 00-291-2, 2020 WL

7

4260795, at *7 (E.D. Pa. July 24, 2020) ("Although Clausen's rehabilitation alone does not qualify

him for a reduced sentence as a matter of law, *see* 28 U.S.C. § 994(t), nothing prevents the Court

from concluding that a combination of factors, including rehabilitation, can together establish

extraordinary and compelling reasons."), *and Henriquez*, 2021 WL 5771543, at *4–5 (concluding

that while the defendant's family circumstances were "not, by themselves, extraordinary," the

combination of those circumstances and the defendant's notable rehabilitation "constitute

extraordinary and compelling circumstances" for reducing his sentence to time served). There is

no binding Third Circuit precedent on this issue.[3]

As explained below, the Court concludes that the approach taken in and endorsed by

*Clausen*, *Henriquez*, and other opinions by courts across multiple Circuits and Districts, *see, e.g.*,

*Brown*, 457 F. Supp. 3d at 704, *Brooker*, 976 F.3d at 238, better gives full meaning and force to

the language of 28 U.S.C. § 994(t) and therefore applies that approach here.

With these principles in mind, the Court turns to Mr. Brown's asserted extraordinary and

compelling reasons for a sentence reduction.

---

[3] It appears that two other Courts of Appeals have opined on the role of rehabilitation in compassionate release motions, including whether it may interact with other factors such that it joins with those factors to collectively create extraordinary and compelling reasons. *Compare Brooker*, 976 F.3d at 237–38 ("[T]he consideration of [rehabilitation and other] factors and of their possible relevance, whether in isolation *or in combination*, is best left to the sound distraction of the trial court in the first instance." (emphasis added)), *with United States v. Whited*, No. 21-1644, 2022 WL 1259028, at *2 (7th Cir. Apr. 28, 2022) (concluding that district courts should not consider rehabilitation as part of the "extraordinary and compelling reasons" analysis and that it is "more suitably addressed as part of the § 3553(a) analysis"). The Second Circuit has determined that district courts have discretion to determine whether a combination of factors including rehabilitation may constitute extraordinary and compelling circumstances, even if none of those factors does so independently—the approach that this Court concludes is appropriate here. While the Seventh Circuit stated in *Whited* that rehabilitation should only be considered after other extraordinary and compelling factors are established, it did so without any apparent analysis of 28 U.S.C. § 944(t) and in reliance on its prior decision in *United States v. Ugbah*, 4 F.4th 595, 597 (7th Cir. 2021), which also did not address § 944(t). This Court concludes as explained in this Opinion that declining to consider rehabilitation unless other extraordinary and compelling factors are independently established does not give full meaning to the text of § 944(t), and that the conclusion and detailed reasoning of the Second Circuit in *Brooker* is the more accurate assessment of the prevailing law.

### 1. **Medical Conditions**[4]

First, the Court concludes that based on the record before it, Mr. Brown's individual medical conditions, standing alone or in combination, do not constitute extraordinary and compelling reasons warranting a reduction in his sentence. That said, Mr. Brown's hypertension is significant and serious, and is even more so due to his obesity—and as explained below, when considered in conjunction with the balance of the record, these conditions support the existence of "extraordinary and compelling" reasons for this Court to reduce his sentence.

### a. **Hypertension**

Mr. Brown explains that he suffers from hypertension and argues that the state of his hypertension is concerning both in itself and because he asserts it would put him at severe risk of illness or death if he became infected with COVID-19. Mr. Brown asserts that "his dangerous high blood pressure readings are now out of control." (ECF No. 332, at 14.) For example, while "[t]he normal systolic reading for a male is less than 120, and the normal diastolic reading is less than 80" (*id.*), Mr. Brown's systolic figures were above 120 in 16 of 18 readings recorded between July 2012 and March 2021 in the medical records provided to the Court, and his diastolic figures were above 80 in 16 of those 18 readings (ECF Nos. 344, at 7, 13, 17, 18, 20, 22, 25, 26; 362, at 43; 368, at 2). Two-thirds of those 18 readings between July 2012 and March 2021 also reflect "stage 2 hypertension," defined as "a systolic pressure of 140 [] or higher or a diastolic pressure of 90 [] or higher," and categorized as one level below "hypertensive crisis," which is "a blood pressure measurement higher than 180/120." (*See* ECF Nos. 362, at 43; 343, at 11; 368, at 2; *High Blood*

---

[4] Some citations in this Opinion reference sealed filings on the docket from Mr. Brown's medical record, but the information contained in and referenced from those filings is also contained within unsealed filings or is of the same nature as information that is public in the unsealed filings.

*Pressure (Hypertension)*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417 (last visited July 8, 2022).) Mr. Brown claims that in response to some of his blood pressure readings, multiple medical personnel within the BOP have warned Mr. Brown that he is at risk of complications such a stroke or heart attack due to his hypertension, and one nurse "advised him that he should seek compassionate release." (ECF No. 332, at 15–16.)

In addition to highlighting his serious hypertension, Mr. Brown asserts that he was not receiving appropriate care for this condition while he was in BOP institutional custody, instead receiving care that was "non-responsive, sporadic and/or suspended," and he claims that he "would receive better treatment outside of the institution." (ECF Nos. 332, at 17–18; 343, at 12, 15–17.) "Although he [wa]s being seen in the institution's chronic care unit for hypertension" while at FCI Hazelton, Mr. Brown argues that his blood pressure readings, which remained "out of control" despite the fact that Mr. Brown was "taking his medications and [had] cut his salt intake as instructed," make it "clear that neither NEOCC nor FCI Hazelton have been able to control Mr. Brown's blood pressure" during the times he has been incarcerated at those facilities. (ECF Nos. 332, at 17–18; 392-1, at 1 (providing the medical declaration of Dr. George Bren, who opined that "[g]iven that the target for treatment . . . is <130/<80, one can see that at no time in the past 8 years has Mr. Brown's [blood pressure] been appropriately treated").) Mr. Brown states that while he was incarcerated, he "ha[d] no ability to obtain alternative and more effective health care" (ECF No. 332, at 18), and he seems to argue that he would have more frequent opportunities to consult with doctors about his hypertension when outside of prison (*see* ECF No. 343, at 15–17).

Mr. Brown also cites multiple sources that indicate that people with hypertension are more likely to become seriously ill or die as a result of COVID-19. (ECF No. 332, at 16–17.) Further,

Mr. Brown argues that "[u]ncontrolled high blood pressure can lead to [other] complications,"
such as heart attack or stroke, that not only are significant concerns in themselves but also place
individuals at increased risk for severe illness from COVID-19. (*Id.* at 18–19.) According to Mr.
Brown, the risk that he would become seriously ill or worse if infected with COVID-19 due to his
hypertension and possible future results of that hypertension was even more significant when he
was incarcerated at FCI Hazelton in light of the COVID-19 statistics and mitigation abilities at
that facility. Mr. Brown asserts that "FCI Hazelton has been significantly infected by the COVID-
19 virus," with 161 inmates (including then-positive-for-COVID-19 inmates and those who had
recovered) and 72 staff having been infected at some point as of January 2021. (ECF Nos. 332, at
26; 343, at 13–14.)[5] Mr. Brown also argues that crowded conditions and the lack of mask- and
glove-wearing and other cleaning mechanisms—much of which, as Mr. Brown acknowledges, is
the reality in the prison setting generally and not just at FCI Hazelton—increased the risk that Mr.
Brown would contract COVID-19 while at that facility. (ECF No. 332, at 27–29.)

---

[5] According to Mr. Brown, in February 2021, the BOP was "reporting fewer historical cases of inmate infection" than
it had in prior months, and "the one reported death [prior to February 2021] ha[d] [] been inexplicably deleted from
the published statistics," thus calling into question the reliability of BOP's data. (ECF No. 343, at 14.) As of the date
of this Opinion, the BOP reports that at FCI Hazelton, 159 inmates and 124 staff have recovered from COVID-19
infection, and two inmates have died as a result of the virus. *COVID-19: Coronavirus*, Fed. Bureau Prisons,
https://www. bop.gov/coronavirus/ (last updated July 7, 2022).

Comparison of the data reported by Mr. Brown in his Motion as of January 2021 and the data currently
reported by the BOP on its COVID-19 tracking website suggests that adjustments have been made to the data over
time (for example, the January 2021 report of one inmate death and 161 recovered inmates indicates that 162 inmates
had contracted COVID-19 as of that date, while the current report of two inmate deaths and 159 recovered inmates
indicates that only 161 inmates have contracted COVID-19 as of this date).

However, for two reasons, the Court does not draw any conclusions from this data as to Mr. Brown's
suggestion that BOP data on the presence and outcomes of COVID-19 at FCI Hazelton are unreliable. First, the BOP
notes on its COVID-19 tracking website that "[d]ata is subject to change based on additional reporting," and the Court
observes that data may also change based on the movement of inmates between facilities or other factors impacting
the BOP's reporting. Second, Mr. Brown's current status as being on home confinement and not currently being at
FCI Hazelton materially reduces the weight that this Court places on the historical and present status of COVID-19
cases and outcomes at FCI Hazelton.

The Government argues in response that Mr. Brown's hypertension is not an extraordinary and compelling reason for this Court to grant him compassionate release for three main reasons: (1) Mr. Brown "provides no evidence that his hypertension substantially impairs his ability to perform self-care"; (2) Mr. Brown does not "provide this Court with any evidence that he would receive better treatment than the type rendered by the BOP if he was released from prison;" and (3) the Centers for Disease Control and Prevention (CDC) does not consider hypertension a condition that might increase a person's risk of severe illness from COVID-19. (ECF No. 340, at 18.)[6] The Government urges this Court to deny Mr. Brown's Motion to the extent it asserts that hypertension is an extraordinary and compelling reason for early release, regardless of whether the Court applies the Sentencing Commission's pre-First Step Act definition of extraordinary and compelling non-terminal illness, because Mr. Brown faces no heightened health risks based on his hypertension if he contracts COVID-19 and because COVID-19 is under control at FCI Hazelton. (*Id.* at 18–19.)

While the question of whether Mr. Brown's hypertension, when considered in isolation, is extraordinary and compelling is a close one, the Court concludes that Mr. Brown has not demonstrated that his hypertension is an extraordinary and compelling reason alone for the Court to grant his compassionate release Motion if the Court were to consider it apart from other factors that Mr. Brown asserts as bases for a sentence reduction. The Court acknowledges that Mr.

---

[6] The Government's claim that "[h]ypertension is not listed by the CDC as a condition that might increase a person's risk of severe illness from the virus that causes COVID-19" (ECF No. 340, at 18) is not entirely accurate. The CDC states that "[h]aving heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and *possibly* high blood pressure (hypertension) can make you more likely to get very sick from COVID-19." *People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (Feb. 25, 2022), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (emphasis added). Thus, as many cases have acknowledged, according to the CDC, hypertension is mentioned as a concerning underlying condition for those who contract COVID-19, even if it is not as concerning as, say, heart failure. *See, e.g., United States v. Johnson*, No. 18-578-01, 2022 WL 901468, at *4 (D.N.J. Mar. 28, 2022). For the purposes of Mr. Brown's Motion, this Court treats hypertension as a condition that may pose increased risks if a person with the condition gets infected with COVID-19.

Brown's hypertension is severe and comes with significant health risks, including the risk that Mr. Brown may experience severe illness if infected with COVID-19. And while some courts in this Circuit have concluded that ordinary hypertension does not justify sentence modification—*see, e.g.*, *United States v. Cole*, No. 04-109, 2022 WL 1082480, at *4 (W.D. Pa. Apr. 9, 2022) (citing cases in the Third Circuit reaching this conclusion)—those cases do not preclude a determination that more severe hypertension can be extraordinary and compelling, on its own or due to its interaction with other relevant factors, such that sentence modification is warranted, especially if the defendant is not receiving adequate medical care. However, the Court concludes that Mr. Brown's Motion falls short of showing that the care that he acknowledges he was receiving for his hypertension while in BOP institutional custody was qualitatively inferior to the care he would receive if released—such as the care he likely is now receiving while on home confinement—or that he has had difficulty providing self-care or any other difficulties, either at a BOP institution or on home confinement, as a result of his hypertension, aside from anxiety about his condition.[7] In addition, even assuming that Mr. Brown had shown that he was receiving inadequate care while in BOP institutional custody at FCI Hazelton, Mr. Brown's current status as serving a portion of his term of incarceration on home confinement reduces the weight of that argument and the impact that it would have on this Court's analysis at this time of Mr. Brown's asserted extraordinary and compelling reasons for a sentence reduction. *See United States v. Demniak*, No. 20-63, 2021 WL 5324035, at *9 (W.D. Pa. Nov. 16, 2021).

---

[7] Because Mr. Brown is currently on home confinement, the Court does not discuss here the current conditions at FCI Hazelton related to Mr. Brown's susceptibility to COVID-19 infection, or Mr. Brown's arguments as to past conditions at that facility, because those past or present conditions at FCI Hazelton do not impact Mr. Brown when he is not residing there. And were he to be returned to BOP institutional custody, the record does not reflect that it would necessarily be at FCI Hazelton.

The Court first explains its conclusion that Mr. Brown has not shown that he received inadequate medical care for his serious hypertension while in BOP institutional custody such that his hypertension on its own is not extraordinary and compelling. Mr. Brown's assertions, made when his Motion was filed and when he was at FCI Hazelton, that he would receive better care for his hypertension outside of prison, and thereby be less at risk from complications resulting from hypertension due to COVID-19 or otherwise, are either too general or speculative or, to the extent Mr. Brown points to other possible sources of care, do not address the primary issue with his hypertension, *i.e.*, that his blood pressure is consistently very high. The most specific claim that Mr. Brown makes as to the care he would receive for his hypertension (as well as other medical conditions) if released (which he may in fact be receiving now while on home confinement) is that he "expects to obtain private health care coverage through his business upon release," or, in the alternative, medical care through the Veterans Administration (VA), which would enable him to receive treatment either at a VA facility or possibly in the private sector if he is a certain distance away from a VA facility or needs to wait more than a certain number of days for appointments at that facility. (ECF No. 343, at 17.) Mr. Brown attempts to contrast these possibilities from his circumstances when he was in institutional custody; for example, he asserts that his January 28, 2021 request for "care and consultation regarding his high blood pressure and other issues, and an opportunity to discuss his deteriorating health with a physician at FCI Hazelton," was met with a response that "he would have another followup in May," as he had been seen for hypertension-related appointments in the chronic care unit on November 30, 2020 and January 21, 2021. (*See id.* at 16–17; ECF Nos. 343-3, at 1; 343-4, at 1.)

This example of BOP's alleged failure to provide adequate care for Mr. Brown's hypertension does not show that Mr. Brown's hypertension-related care at the BOP facility was

14

generally inadequate. *See, e.g.*, *United States v. Hoover*, No. 18-00188, 2021 WL 531960, at *5 (W.D. Pa. Feb. 12, 2021) (finding that the defendant was "generally receiving adequate care" because "[t]hough there has been some delay in receiving recommended treatment, it is not as if the BOP medical staff have ignored his medical needs or requests"). Nor does it show that Mr. Brown's care for hypertension while he was incarcerated at a BOP facility was inferior to what he would receive outside of prison. First, Mr. Brown has not shown that it is certain or even likely that he would be or is able to meet with a physician for hypertension consultation or treatment more than every two-to-four months outside of prison; and second, even if more frequent consultation was or is possible, Mr. Brown does not allege that he would be or has been offered treatments that are qualitatively different from and better than those that he received in the hypertension chronic care unit at FCI Hazelton *(e.g.*, medication and recommended diet changes) and that would certainly or likely lower his blood pressure.

Aside from Mr. Brown's claims that he would be able to seek medical care through the private sector and/or the VA if released from prison (which he may be doing now), Mr. Brown's Motion only contains conclusory claims that whatever his hypertension care options would be or are outside of FCI Hazelton, they necessarily must be better than those at the prison. (*See, e.g.*, ECF Nos. 332, at 17–18 ("It seems clear that neither NEOCC nor FCI Hazelton have been able to control Mr. Brown's blood pressure for the past many months. . . . Under the circumstances, Mr. Brown has no ability to obtain alternative and more effective health care for his high blood pressure . . . ."); 343, at 16 ("Clearly, the Defendant would receive better treatment outside of the institution."), 17 ("It seems fairly clear that any such health care [outside of prison] will be far superior to the non-responsive, sporadic, and/or suspended care he is now receiving at the hands of the BOP.").) These largely conclusory assertions do not provide a basis on which the Court

15

should conclude that Mr. Brown's hypertension, which "the facility personnel ha[d] been unable" to improve despite "enroll[ing] [him] in the hypertension chronic care clinic" and "prescrib[ing] [him] medications to reduce his high blood pressure," would improve if he was under the care of different care providers. (ECF No. 332, at 15.) *See, e.g.*, *United States v. Eccleston*, 543 F. Supp. 3d 1092, 1141 (D.N.M. 2021) ("[T]he evidence does not demonstrate that the BOP is providing [the defendant] with poor medical care, and the Court declines to speculate that [he] would receive better care outside of prison."); *United States v. Ward*, No. 13-48, 2020 WL 3469732, at *9 (M.D. Tenn. June 25, 2020), *aff'd*, 823 F. App'x 418 (6th Cir. 2020) ("Defendant also has failed to show that he actually, not just theoretically, will fare better outside of BOP custody . . . . As for Defendant's underlying medical conditions upon which he relies, [] the Court cannot conclude that they would be better managed outside of BOP custody."). *Cf. United States v. Iezzi*, No. 17-00157, 2021 WL 5832767, at *8 (W.D. Pa. Dec. 9, 2021) (evaluating the defendant's statements that he would receive better medical care outside of the BOP in performing the § 3553 analysis as to the defendant's compassionate release motion and finding that because the statements were "rather uncertain at best," they "d[id] not tip the scales in favor of release").

As Mr. Brown acknowledges, while he was incarcerated at a prison facility, the medical staff worked to manage Mr. Brown's hypertension by treating him in the hypertension chronic care unit, administering him medication, and recommending other steps he can take to improve his condition, such as reducing his salt intake, which Mr. Brown has done. While Mr. Brown's blood pressure readings are high and consistently place him in the "stage 2 hypertension" category, they do not reflect a dramatic or irreversible increase over time, but rather have fluctuated within a certain albeit elevated range. Further, Mr. Brown does not argue, and Mr. Brown's medical records do not reflect, that he has actually experienced adverse medical events as a result of his

hypertension despite the increased risk of such events that hypertension poses. Thus, the record suggests that Mr. Brown's hypertension, even though it is concerning, was at least somewhat controlled while he was at FCI Hazelton with what appear to have been appropriate and timely medical interventions. *See United States v. Matos*, No. 19-113, 2022 WL 702858, at *5 (D.N.J. Mar. 9, 2022) ("Even in the pre-[COVID-19 ]vaccination era, release was regularly denied based on such chronic, controlled conditions . . . .").

Had the record demonstrated a decline in Mr. Brown's condition over time in the form of steadily rising blood pressure levels and/or the onset of severe or pervasive complications resulting from those levels, or had Mr. Brown identified specific hypertension treatment that the BOP cannot provide him that would likely lessen the severity of his condition and that he could obtain only outside of a prison facility, he may have been able to show that his hypertension was not being controlled as much as it should or can be. *See, e.g.*, *United States v. Skrine*, No. 15-160, 2021 WL 71233, at *5 (W.D. Pa. Jan. 8, 2021) (concluding that the defendant showed extraordinary and compelling reasons for the Court to release the defendant to home confinement where his medical conditions went from "hav[ing] been significant for some time," to being "substantial, multifaceted, and accelerating in a negative direction" and "exacerbated by a series of compounding negative medical events" such that it was demonstratively "likely that [the defendant] will have to spend significant amounts of time" at facilities outside of his BOP facility for treatment); *Hoover*, 2021 WL 531960, at *5 (concluding that the defendant showed extraordinary and compelling medical circumstances, despite generally receiving adequate care at the BOP facility, because the ongoing nature of the treatment that the defendant required both within and outside of the BOP facility, based in part on his somewhat regular "reports of

17

experiencing substantial pain," "differentiate[d] his medical situation from others" just enough "to rise to the level of 'extraordinary and compelling'"). Mr. Brown has not made this showing.

Even if Mr. Brown had shown that the state of his hypertension and treatment for that condition at FCI Hazelton constituted extraordinary and compelling circumstances, "[o]n August 17, 2021, Mr. Brown was released from BOP custody to home confinement pursuant to the CARES Act." (ECF No. 395, at 1.) Thus, assuming Mr. Brown had shown that better care is available to him for his hypertension outside of prison, Mr. Brown's hypertension-based argument would be less compelling now that he is on home confinement and can seek medical care outside of FCI Hazelton. As this Court has explained in other cases, Mr. Brown's current status of serving his incarceration term outside of a BOP facility "does not moot h[is] instant Motion[,] as such form of CARES Act relief may be temporary and is therefore distinguishable from the relief []he seeks here under the First Step Act"; however, Mr. Brown's home confinement "does tend to negate any potentially 'extraordinary and compelling' nature of h[is] current situation" when considering Mr. Brown's hypertension separately from other asserted extraordinary and compelling circumstances in his Motion. *Demniak*, 2021 WL 5324035, at *9.

In sum, for the reasons explained above, Mr. Brown has not demonstrated that his severe hypertension, while medically serious and concerning, is an independently extraordinary and compelling reason for this Court to grant his Motion.[8]

---

[8] The fact that Mr. Brown has not shown that the care for hypertension he was receiving or would receive while in BOP institutional custody is qualitatively less effective than that which he would receive outside of a BOP facility should not be taken as any suggestion that his institutional custody should possibly continue for the purpose of Mr. Brown receiving BOP medical care. The Court's conclusion is instead simply a reflection that the record does not demonstrate that early termination of BOP custody is compelled by the need for Mr. Brown to receive medical care outside of the BOP that is unavailable to him in BOP institutional custody.

18

### b. **Obesity**

Next, Mr. Brown asserts that he is obese and is thus at an increased risk of experiencing more severe illness if he becomes infected with COVID-19. Mr. Brown avers that his "weight has consistently been between 245 and 255 pounds" since July 2015, and he cites to multiple medical sources that describe "the many dangers posed by a COVID-19 infection to an obese person." (ECF No. 332, at 20–23.) The Government relies on the portion of Mr. Brown's medical records from FCI Hazelton that state that on November 9, 2020, Mr. Brown was 210 pounds—and thus is overweight, not obese—to argue that Mr. Brown merely claims that he is obese but cannot back up his claim. (ECF No. 340, at 17 (citing ECF No. 337, at 17).)

The medical records provided to the Court during this Motion's pendency clearly indicate that Mr. Brown is generally an obese person and strongly suggest that the November 9, 2020 weight entry was an error, as Mr. Brown asserts and as the Court concludes to be the case. Between January 2014 and October 2020, Mr. Brown's weight ranged between 240 and 265 pounds (ECF No. 343, at 9–10 (citing Mr. Brown's medical records from the Northeast Ohio Correctional Center (NEOCC), where he was incarcerated before being transferred to FCI Hazelton)); on March 24, 2021, four months after the reported November 9, 2020 weight measurement of 210 pounds, Mr. Brown's weight was 256 pounds (ECF No. 375, at 48). The Court concludes from this record and by employing its common sense that Mr. Brown did not mysteriously and precipitously lose 55 pounds and then gain 46 pounds just as quickly and instead concludes that the November 9, 2020 reported weight was a BOP reporting error. All of the reported weight figures, except for the likely erroneous one-time figure of 210 pounds, would put Mr. Brown into the "obese" category based on a measure of body mass index. (*See* ECF No. 332, at 21 (citing *Am I Morbidly Obese?*,

19

Columbus Regional Health Weight Loss Institute, https://columbusweightloss.com/resources/am-i-morbidly-obese/ (last visited July 8, 2022)).)

Nonetheless, Mr. Brown has not established that his obesity has impacted his ability to perform self-care in a prison setting or has otherwise been a detriment to him aside from potentially causing him concern related to COVID-19 and his overall health. Further, several courts in the Third Circuit have denied motions for compassionate release in which the defendant asserted that obesity, alone or in combination with other conditions, including hypertension, constituted extraordinary and compelling reasons for release or sentence reduction. *United States v. Dunich-Kolb*, No. 14-150, 2022 WL 580919, at *5 (D.N.J. Feb. 14, 2022) (citing cases).

Based on the record here, the Court concludes that Mr. Brown's obesity, standing alone, is not an extraordinary and compelling reason to modify his sentence. However, when considered in tandem with his significant hypertension, Mr. Brown's obesity is a risk factor that elevates the significance and seriousness of his medical situation and is part and parcel of the Court's holistic consideration of Mr. Brown's asserted extraordinary and compelling reasons for a sentence reduction.

### c. **Latent Tuberculosis**

Next, Mr. Brown raises the issue of his latent tuberculosis, as he did in his first Motion to Reduce Sentence, and then argues that despite this Court's prior determination that latent tuberculosis itself does not present an extraordinary and compelling reason for release, the condition constitute such a reason "when considered in combination with his other medical infirmities." (ECF No. 332, at 24.) In response, the Government emphasizes the fact that Mr. Brown's latent tuberculosis has not caused him any negative symptoms while he has been incarcerated. (*See* ECF No. 340, at 16–17.)

The Court concludes that on the record here, Mr. Brown's latent tuberculosis does not contribute to create extraordinary and compelling circumstances, given that the Court's prior observations about this condition are still true and that the record lacks evidence that latent tuberculois interacts with Mr. Brown's other medical conditions in a way that would make the latent tuberculosis extraordinary and compelling or nearly so. (*See* ECF No. 305, at 5.)

### d. **Other Medical Issues**

Lastly, Mr. Brown argues that his inability to obtain certain requested medical testing and services while in BOP institutional custody—for example, diagnostic testing to measure his overall health, treatment for swollen testicles, and dental care—creates extraordinary and compelling circumstances for his release from custody to allow him to receive such testing and treatment. (ECF Nos. 332, at 25; 343, at 13.) Of these other medical issues Mr. Brown discusses, his efforts to obtain dental care are the most well documented. The record shows that in 2017 while at NEOCC, Mr. Brown complained of a loose tooth and resulting pain and difficulty with eating and drinking, and it appears he was advised to try to avoid chewing in the area. (*Id.* at 16–17.) Mr. Brown requested cavity fillings in April 2020 and again in July 2020 but was told of mandated restrictions on routine dental treatment at prison facilities due to the COVID-19 pandemic, a policy that Mr. Brown describes as "heartless." (ECF No. 344, at 29–30.) Finally, the medical records show that Mr. Brown had an "admission and orientation" or "A&O" dental exam in January 2021 after he was transferred to FCI Hazelton, at which he was instructed on how to obtain routine and emergency dental care, and the exam record did not note any specific issues with his doing so. (ECF No. 362, at 58.) The Government's Response does not address Mr. Brown's medical concerns beyond his hypertension, obesity, and latent tuberculosis.

21

The Court concludes that these additional medical concerns do not tip the scale such that Mr. Brown's medical conditions on their own are extraordinary and compelling reasons for this Court to reduce his sentence. The Court does not doubt that Mr. Brown's concerns are legitimate and sympathizes with his inability to obtain testing and treatment that might give him greater peace of mind and comfort. However, such circumstances do not rise to the level of extraordinary and compelling. *Cf. United States v. Bandrow*, 473 F. Supp. 3d 778, 787 (E.D. Mich. 2020) (concluding that delays in medical services at BOP facilities are understandable in the COVID-19 era, but that where the "basic medical care" that the defendant was not able to obtain while incarcerated related to a "potentially serious kidney issue" that the facility knew constituted a "critical illness," compassionate release was warranted). Further, given that Mr. Brown has been on home confinement since August 2021, Mr. Brown has now had some time outside of prison during which he has hopefully been able to obtain the types of medical services that had been curtailed by policy to allow prison facilities to manage healthcare resources during the pandemic. *See, e.g.*, *BOP Guidance for Prioritizing Dental Treatment During the COVID-19 Pandemic* (Mar. 20, 2020), https://www.bop.gov/foia/docs//COVIDDentalGuidanceMarchandApril.pdf.

## 2. **Rehabilitation**

Mr. Brown reiterates the argument he made in his first Motion to Reduce Sentence as to his rehabilitation, arguing that in addition to his medical conditions, his rehabilitation—evidenced by a long record of exemplary behavior while on pretrial release and post-conviction release, and while incarcerated—is an extraordinary and compelling reason for his release or sentence reduction. (*See* ECF No. 332, at 30 ("Mr. Brown would only add that his exemplary behavior has continued since the date of this Court's initial compassionate release denial on July 29, 2020."); ECF No. 289, at 25–31 (describing Mr. Brown's exemplary conduct throughout the history of this

22

case, including his lack of infractions, his leadership roles in multiple group programs, and his employment while at NEOCC).) In response, the Government acknowledges that "by all accounts Brown has worked at rehabilitating himself," but it argues that "the fact that Brown has taken steps toward improving himself underscores the need for the sentence to provide additional opportunities at reform." (ECF No. 340, at 19–20.)[9]

In its Opinion addressing Mr. Brown's prior Motion to Reduce Sentence, this Court reached two conclusions that are relevant to the analysis of Mr. Brown's present Motion, specifically to the issue of whether Mr. Brown's rehabilitation contributes to create extraordinary and compelling reasons for granting the Motion. First, the Court found that Mr. Brown has indeed demonstrated extraordinary efforts at rehabilitation that have been successful and that call into question the purpose of and need for his continued incarceration. The Court wrote, "[t]he record is absolutely clear: Mr. Brown has been a model inmate and leader in prison programming, he has taken advantage of every rehabilitative program offered at NEOCC, and he has made a successful, genuine, and commendable effort to better himself. His record of achievements while at NEOCC is truly exemplary." (ECF No. 305, at 8.) And later, "[c]onsidering . . . Mr. Brown's conduct since his conviction, this Court cannot easily identify the correctional need for Mr. Brown to remain imprisoned for the nearly ten-year balance of the imposed term of custody." (*Id.* at 8 n.2).

Second, however, the Court concluded in resolving Mr. Brown's prior Motion that it could not grant that Motion on the basis of his demonstrated rehabilitation because no other extraordinary

---

[9] Both parties discuss Mr. Brown's rehabilitation as part of their arguments related to whether the sentencing factors in 18 U.S.C. § 3553(a) weigh in favor of a sentence reduction, rather than as part of their arguments that extraordinary and compelling reasons exist such that this Court may move on to the § 3553(a) analysis. (*See* ECF Nos. 332, at 30; 340, at 19–20.) Mr. Brown's prior Motion to Reduce Sentence explicitly characterized Mr. Brown's rehabilitation as an extraordinary and compelling reason for modification of his sentence. In light of that as well as the overlap between the "extraordinary and compelling reasons" analysis and the § 3553(a) analysis when an asserted reason for sentence modification is rehabilitation, this Court considers Mr. Brown's rehabilitation as a part of both portions of its analysis.

and compelling reasons for his release or sentence reduction had been provided, and rehabilitation alone cannot be a basis for taking such action per 28 U.S.C. § 994(t), which is not advisory. (ECF No. 305, at 8.) More specifically, the Court concluded that Mr. Brown's latent tuberculosis was not an extraordinary and compelling reason based on his medical records, which demonstrated limited impact of that condition on his wellbeing, and based on the fact that generalized concerns about COVID-19 and its impact if he were to become infected do not constitute extraordinary and compelling reasons. (*Id.* at 5–6.) In addition, the Court concluded that "Mr. Brown's other arguments for finding an 'other [extraordinary and compelling] reason' for release d[id] not have a sufficient basis in law." (*Id.* at 8.) Thus, no other circumstances existed that would "combine with or go above and beyond [Mr. Brown's] rehabilitation to provide an extraordinary and compelling reason to reduce his sentence." (*Id.*)

Based on the record now before the court as to this second Motion, that first conclusion remains true—Mr. Brown has continued his extraordinary conduct and appears to be significantly rehabilitated—but the picture as to the second conclusion has changed. As explained above, Mr. Brown has not shown that his documented health conditions are, on their own and without considering any other asserted reasons for a sentence reduction, sufficient to warrant that reduction. But unlike the record before the Court as to Mr. Brown's prior Motion, the record now shows a medical condition, hypertension, that is both significant and of serious concern; while to date it may not have caused Mr. Brown to have a heart attack or stroke or experience any of the other risks associated with hypertension of his level, the risk of those severe and possibly fatal complications is both high and continual. This is a dramatically different situation than is posed by Mr. Brown's latent tuberculosis—a condition that has been latent since the early 1990s and

24

which comes with far fewer risks of adverse health outcomes—which was the asserted medical basis for compassionate release or sentence reduction in Mr. Brown's prior Motion.

In other words, on its own, Mr. Brown's hypertension is not extraordinary and compelling—but it is close to meeting that mark for the reasons the Court has noted, particularly when considered in tandem with his obesity. Unlike the reasons Mr. Brown previously asserted for a sentence reduction to accompany his rehabilitation, which are either not as concerning (*e.g.*, latent tuberculosis) or cannot legally be a basis for modifying his sentence (*e.g.*, nonretroactive changes to sentencing laws, *see Andrews*, 12 F.4th at 260–61), Mr. Brown's hypertension in the context of his obesity very nearly rises to the level of extraordinary and compelling on its own, such that this Court concludes that it "combine[s] with or go[es] above and beyond [Mr. Brown's] rehabilitation to provide an extraordinary and compelling reason to reduce his sentence." (ECF No. 305, at 8.) Not only do Mr. Brown's medical circumstances amount to being nearly extraordinary and compelling, but Mr. Brown's rehabilitation that this Court concludes it should consider alongside those medical circumstances is far beyond what is normal or expected; Mr. Brown has accomplished far more than "work[] at rehabilitating himself" (as the Government describes his efforts) (ECF No. 340, at 19–20).

As noted above, courts deciding compassionate release motions have reached varied conclusions as to the role of rehabilitation in this calculus, specifically whether an independently extraordinary and compelling reason must exist before the court can consider or credit rehabilitation. *See, e.g.*, *Taylor*, 2022 WL 1321989, at *5; *Adens*, 2022 WL 1226965, at *5; *Clausen*, 2020 WL 4260795, at *7; *Henriquez*, 2021 WL 5771543, at *4–5. Resolving the "extraordinary and compelling reasons" inquiry by considering rehabilitation even when there are not discrete independently extraordinary and compelling reasons exist gives full meaning and force to the

language of 28 U.S.C. § 994(t). Section 994(t) states that "[r]ehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason" (emphasis added). Congress could have written, "rehabilitation of the defendant shall not be considered in determining whether extraordinary and compelling reasons exist," but its inclusion of the word "alone" strongly suggests that rehabilitation is permitted to have a role, even a significant one, in courts' analysis of compassionate release motions. If rehabilitation could not be considered unless one or more other extraordinary and compelling reasons were independently present, then there would be no need to consider rehabilitation at all—since at least one other extraordinary and compelling reason would certainly otherwise exist, and sentence modification under § 3582(c)(1)(A)(i) only requires that such reasons exist and not that a certain magnitude of "extraordinary and compelling" circumstances is shown. In that application of § 944(t), rehabilitation would have no role, which is inconsistent with the language of the statute.

This application of § 994(t) is also consistent with the Third Circuit's broader direction to the district courts. The court in *United States v. Gordon*, applying the Third Circuit's precedential *Andrews* decision, explained that "[o]ur Court of Appeals gives district courts 'considerable discretion' but within limits in compassionate release cases." No. 99-348-2, 2022 WL 377395, at *6 (E.D. Pa. Feb. 7, 2022). "[G]rant[ing] compassionate release based on a reason that has been specifically forbidden"—such as subsequent "changes in the law since [a defendant's] sentencing" and "the draconian length of [a legally imposed] sentence"—goes beyond those limits. *Id.* But in this Court's estimation, it *is* well within those limits to conclude that a health condition that falls just short of impacting a defendant's ability to perform self-care or otherwise diminishing the quality of the defendant's life during his period of incarceration, in combination with that defendant's extraordinary rehabilitative efforts and results, constitute extraordinary and

26

compelling reasons for release or sentence reduction. In that scenario, neither reason "alone" is the genesis of the extraordinary and compelling basis for relief, but considered together, the bar to show extraordinary and compelling reasons for relief has been cleared.

The reasoning of cases from outside of this Circuit also supports this Court's conclusion that Mr. Brown has demonstrated a set of circumstances that considered as a whole constitute extraordinary and compelling reasons for a sentence modification. For example, in *United States v. Brown*, the court concluded that the defendant had demonstrated "something more" beyond his rehabilitation in his second compassionate release motion that the court had concluded was required in denying his first motion. 457 F. Supp. 3d at 701. There, the "something more" was "a global pandemic that endangers all prisoners—and especially [the] [d]efendant," a post-First Step Act "sentencing disparity" impacting the defendant, and the defendant's particularized risk of serious COVID-19 illness. *Id.* at 701–04. While those "something more[s]" do not directly apply here, either because the Third Circuit has precluded it, *see United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (addressing general pandemic concerns), *Andrews*, 12 F.4th at 260–61 (addressing post-sentencing changes in law), or because they are irrelevant under Mr. Brown's present circumstances on home confinement, that reasoning—that while a defendant may not "fit in one of the three categories that once formed the heartland of compassionate release cases," such as having a terminal illness, Congress has "sought to open compassionate release to more inmates" and the Sentencing Commission has provided for catch-all "other reasons" that may warrant a sentence modification—is instructive in this case. *Brown*, 457 F. Supp. 3d at 703–04; *see also Brooker*, 976 F.3d at 237–38 ("[T]he consideration of [] factors and of their possible relevance, whether in isolation or in combination, is best left to the sound distraction of the trial court in the first instance."); *United States v. Elias*, 984 F.3d 516, 519–20 (6th Cir. 2021) ("[I]n the absence of

an applicable policy statement for inmate-filed compassionate-release motions, district courts have discretion to define 'extraordinary and compelling' on their own initiative.").

Considering Mr. Brown's rehabilitation in combination with and in the context of his medical conditions (and vice versa), the Court concludes that Mr. Brown has demonstrated multiple reasons that, while not quite sufficient independently, combine to constitute extraordinary and compelling circumstances for this Court to grant his Motion if the consideration of the § 3553(a) sentencing factors suggest that such is appropriate. And for the reasons set out below, the Court concludes that the § 3553(a) sentencing factors make granting the Motion the correct course of action.

## C. The § 3553(a) Sentencing Factors

Having concluded that extraordinary and compelling reasons exist for this Court to modify Mr. Brown's sentence, the Court now considers the sentencing factors set forth in 18 U.S.C. § 3553(a) as it is required to do under § 3582(c)(1)(A).

The determination of "whether to reduce an eligible defendant's term of incarceration for compassionate release after considering the § 3553(a) factors is committed to the discretion of the [district court]." *United States v. Jones*, No. 12-000038, 2020 WL 3871084, at *4 (W.D. Pa. July 8, 2020) (citing *United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020)). That discretion includes the district court's authority to consider the length of the defendant's original custodial sentence, including the portions served and remaining, when weighing the § 3553(a) factors. *Pawlowski*, 967 F.3d at 330–31. The overarching question the Court must answer is whether a "point [has] been reached that the purposes of sentencing can and will be fulfilled with a modified sentence that does not include further BOP custody" in some form. *See, e.g., Skrine*, 2021 WL 71233, at *5. (c)(1)(A). "In considering the section 3553(a) factors, [the Court] should assess

28

whether those factors outweigh [any] 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Bess*, 455 F. Supp. 3d 53, 66 (W.D.N.Y. Apr. 22, 2020) (citation omitted).

Mr. Brown's and the Government's positions relative to the § 3553(a) factors primarily consist of their arguments as to whether Mr. Brown's rehabilitation warrants a sentence modification. (*See* ECF Nos. 332, at 30; 340, at 19–20.) Mr. Brown states that his rehabilitation demonstrates the mitigating statutory factors that allow this Court to reduce his sentence consistent with § 3553(a). (ECF No. 332, at 30.) The Government contends that his ongoing rehabilitation shows that carrying out the duration of his sentence will only help him rehabilitate further;[10] it also argues that Mr. Brown's criminal history demonstrates that he would be "a danger to the community if he is prematurely released" and that his current sentence should remain intact for retribution and deterrence purposes. (ECF No. 340, at 19–20.)

The Court's Opinion regarding Mr. Brown's first Motion to Reduce Sentence provides the starting point for the Court's analysis here. Based on Mr. Brown's "model" behavior, "*successful, genuine, and commendable effort to better himself,*" and "record of achievements" while incarcerated—which show character that has been consistent with Mr. Brown's statements and demeanor before this Court—on the decisions by both the magistrate judge and previously assigned district judge to place Mr. Brown on bond whenever possible (ECF Nos. 15, 51, 140),

---

[10] Of course, incarceration may not be imposed for the purpose of rehabilitation. 18 U.S.C. § 3582(a); *Tapia v. United States*, 131 S. Ct. 2382, 2391 (2011). Further, the Government does not identify what rehabilitative efforts remain for Mr. Brown to undertake and then successfully complete and that can be achieved only via more time in federal prison, or why only 80-plus more months in BOP custody is essential to that task. And the record, especially the sentencing judge's observations and actions, does not reflect a judicial finding by the sentencing judge that 180 months in prison, and nothing less, was necessary for Mr. Brown to be rehabilitated or for the purposes of sentencing to be fulfilled; rather, Mr. Brown's sentence appears to have instead been driven by a statutory minimum sentence and not by an individualized assessment of his situation as of the time of sentencing as settled sentencing law requires (at least in a case without a statutory minimum sentence). (*See* ECF No. 305, at 8 n.2.)

and on the sentencing judge's assessment that the mandatory sentence in Mr. Brown's case was "harsh" and "more than enough" to fulfill the purposes of sentencing under the circumstances (ECF Nos. 129, at 17–18; 193, at 15), the Court stated that it "could not easily identify a correctional need for Mr. Brown to remain imprisoned" for the remainder of his sentence. (ECF No. 305, at 8 & n.2 (emphasis added).) "From where the Court s[at]" in July 2020, "Mr. Brown's arguments that the purposes of sentencing under 18 U.S.C. § 3553(a) have by now been fulfilled by the considerable period of custody he has already served carr[ied] some substantial force." (*Id.* at 8 n.2.)

As the record now stands, these statements remain true, and Mr. Brown's circumstances weigh even more in favor of release based on the factors articulated in § 3553(a) than they would have in July 2020. Mr. Brown has now served approximately 97 months of his 180-month sentence (*see* ECF No. 360, at 7 (reflecting that as of March 29, 2021, Mr. Brown had served approximately 82 months of his sentence)), with 89 of those having been served in institutional custody before Mr. Brown was put on home confinement by the BOP in August of 2021. Mr. Brown's projected prison release date accounting for good time credit is March 1, 2027. (*Id.*) While Mr. Brown has not yet served the majority portion of his very long custodial sentence (although he is close to having done so), the 89 months that Mr. Brown was in institutional custody is by any measure a significant amount of prison time, and the duration of the sentence that Mr. Brown has served is but one consideration in the § 3553(a) analysis—which is significant here because the remaining considerations firmly suggest that release is warranted.

As Mr. Brown's Motion makes clear and as the Court has concluded here and in its prior Opinion, "the history and characteristics of the defendant," § 3553(a)(1), specifically his commitment to bettering himself in the aftermath of his convicted conduct, suggest that the goals

of sentencing have been fulfilled. For the same reasons, "the need for the sentence imposed . . . to protect the public from further crimes of the defendant," § 3553(a)(2)(C), weighs in favor of reducing Mr. Brown's sentence. The BOP's decision to move Mr. Brown from FCI Hazelton to home confinement, which reflected an assessment by the BOP that Mr. Brown was not a serious threat to public safety, *see Folk v. Howard*, No. 22-21, 2022 WL 1122839, at *1 (M.D. Pa. Apr. 14, 2022), *United States v. Calhoun*, 539 F. Supp. 3d 613, 617 (S.D. Miss. 2021), also demonstrates that a sentence reduction is consistent with § 3553(a)(2)(C).

As to "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," § 3553(a)(2)(D), the time that Mr. Brown has served to date has accomplished this goal at least in the areas of educational and vocational training, given that Mr. Brown was successfully running an autobody shop and a convenience store at the time of his arrest (ECF No. 103, at 16), has held multiple leadership roles while in prison (ECF No. 289, at 28), and plans to return to his prior employment pursuits upon release (*id.* at 32). Reducing Mr. Brown's sentence would also still allow the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," § 3553(a)(2)(A), given that the mandatory minimum sentence that he faced in July 2015 was the result of prior conduct that had occurred nearly two decades earlier and that was a marked contrast to the type of life and type of person Mr. Brown had already begun to lead and become.

## IV.   CONCLUSION

The Court has carefully considered the parties' extensive briefing on Mr. Brown's second Motion to Reduce Sentence and whether such briefing demonstrates extraordinary and compelling reasons for Mr. Brown's release. Having done so, the Court concludes that Mr. Brown has shown

31

that such reasons exist, and that reducing his sentence is appropriate in light of the sentencing factors articulated in 18 U.S.C. § 3553(a).

Accordingly, Mr. Brown's Motion to Reduce Sentence Pursuant to Section 404 of the First Step Act (ECF No. 332) is GRANTED. The Court will reduce Mr. Brown's originally imposed sentence by converting 33 months of his remaining term of incarceration to an additional term of supervised release and vacating by reduction the remaining portion of his term of incarceration that exceeds 33 months, such that Mr. Brown shall not be subjected to any further term of BOP custody resulting from his originally imposed sentence in this case. The additional 33-month term of supervised release will be subject to the same conditions of supervised release as apply to the original two-year term of supervised release imposed at the time of sentencing. The previously imposed two-year term of supervised release will be served consecutively to the 33-month term of additional supervised release imposed by this Court's Order, for a total term of supervised release of 57 months measured from the date of this Opinion and accompanying Order.

An appropriate Order will issue.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:    July 8, 2022
cc:    All counsel of record

32